IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LONGROAD ASSET MANAGEMENT LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 4:23-cv-00738-DGK |
| BOILERMAKER-BLACKSMITH NATIONAL PENSION TRUST and JOHN FULTZ, | ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This declaratory judgment action arises under the Employee Retirement Income Security Act of 1974 ("ERISA") as amended by the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"). Plaintiffs Longroad Asset Management, LLC ("LAM"), Longroad Capital Partners III, LP (the "Limited Partnership"), and Longroad Partners III GP, LLC (the "General Partner") seek a declaration that they are not "employers" for purposes of the MPPAA's withdrawal liability provision, and are therefore not liable to Defendants Boilermaker-Blacksmith National Pension Trust (the "Fund") and John Fultz.

Now before the Court are the parties' cross motions for summary judgment. ECF Nos. 95, 99, 102,[1] 104. For the reasons discussed below, the Limited Partnership's motion (ECF No. 95) is DENIED, LAM's motion (ECF No. 99) is GRANTED, the General Partner's motion (ECF No. 102) is GRANTED, and Defendants' motion (ECF No. 104) is GRANTED IN PART and DENIED IN PART.

---

[1] The Court strikes ECF No. 97 as the motion appears to have been filed incorrectly and duplicative. The text portion states it was filed on behalf of the General Partner, but the attached motion is filed on behalf of the Limited Partnership and is the same as ECF No. 95. Likewise, the accompanying suggestions, ECF No. 98, are the same as ECF No. 103.

## Standard

A movant is entitled to summary judgment if he "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court makes this determination by viewing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). "In reaching its decision, a court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). To survive summary judgment, the nonmoving party must substantiate his allegations with "sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotations and citations omitted).

## Procedural Background

This dispute arose in February of 2023, when the Fund sent Plaintiffs a demand letter seeking $1,762,249 in withdrawal liability allegedly triggered when certain former employers withdrew from the Fund. The Fund alleged Plaintiffs were jointly and severally liable for that withdrawal liability because they and Broad Street Tank Holding Co., Inc. ("Broad Street") constituted a partnership-in-fact or joint venture in common control with the withdrawing employers. *See* Default Letter at 5, ECF No. 1-4; *see also* Answer at 27, ECF No. 8 (same).

In response, Plaintiffs filed this action seeking a declaration that they are not "employers" as defined under the MPPAA, and not "in a partnership or joint venture relationship with each other" or Broad Street. Compl. ¶¶ 49–51, ECF No. 1. In addition to this federal lawsuit, Plaintiffs initiated mandatory arbitration to challenge the Fund's withdrawal liability determination. That proceeding is stayed pending resolution of this case.

Plaintiffs have not made any withdrawal liability payments under ERISA's "pay now, dispute later" provision. Consequently, the Fund filed a counterclaim in this lawsuit to enforce that provision. If one or more of the Plaintiffs are deemed an "employer," the Fund seeks thirty (30) days to file a motion regarding the amount of damages owed for purposes of its counterclaim.

Plaintiffs first moved for summary judgment in December of 2024. ECF Nos. 62, 64, 66. The Court denied Plaintiffs' motions without prejudice citing "systemic briefing deficiencies" by both parties. ECF No. 93 at 1. In doing so, the Court highlighted issues with the parties' statements of facts and their legal analysis concerning the partnership-in-fact inquiry.[2] *Id.* at 2–6. Collectively, these issues created an unclear and underdeveloped record, and the Court gave the parties another opportunity to fully present their arguments.

Both sides then moved for summary judgment a second time. ECF Nos. 95, 99, 102, 104. After an initial review of the parties' filings, it was evident that Plaintiffs violated the Local Rules, the Federal Rules of Civil Procedure, and the Court's prior order. The Court directed Plaintiff's counsel to show cause for "why they should not be sanctioned under Rule 11, 18 U.S.C. § 1927, and/or the Court's inherent authority—or alternatively, why their complaint should not be dismissed with *prejudice* under Federal Rule of Civil Procedure 41(b)." ECF No. 122. The Court

---

[2] The Court uses the phrase "partnership-in-fact" to encompass both the partnership and joint venture relationships alleged by the Fund.

will address Plaintiffs' counsel's response to the show cause in a separate order. In short though, the Court is not dismissing this case pursuant Federal Rule of Civil Procedure 41(b).

## Undisputed Material Facts

To resolve the motion, the Court must first determine the undisputed material facts. The Court has limited the facts to those that are undisputed and material to the pending summary judgment motion. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has excluded legal conclusions, argument presented as fact, and proposed facts not properly supported by the record or admissible evidence. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). However, the Court has included inferences from undisputed material facts and facts the opposing party has not controverted properly. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

### The Fund and John Fultz

The Fund is a multiemployer pension plan that administers and provides retirement benefits to thousands of union Boilermakers and their families. John T. Fultz is a fiduciary of the Fund and was added to the action by stipulation of the parties so that he could assert the counterclaim on behalf of the Fund.

### The Limited Partnership

The Limited Partnership was established in or about 2009 as a Delaware limited partnership. It has one general partner and 28 limited partners who own 99.96503% of the partnership. The Limited Partnership has no employees.

The Limited Partnership is a pooled investment vehicle. Each investor (i.e., limited partner) makes an investment by purchasing an interest in the fund entity, and the adviser uses that money to make investments on behalf of the fund. The aggregate capital commitments of the limited partners totaled $283 million. As a private equity fund, the Limited Partnership's main

4

function was to make investments on behalf of its limited partners. The Limited Partnership invested in companies with LAM acting as its management agent. In doing so, the Limited Partnership solely acted through LAM.

The Limited Partnership's investments involved special situations such as the acquisition of assets through section 363 bankruptcy sales, the purchase and restructuring of troubled first and second lien bank loans, the purchase of discounted or junk bonds, and the purchase of undervalued equity securities. For several investments, LAM, on behalf of the Limited Partnership, created entities through which the Limited Partnership acquired a debt.

**The General Partner**

The General Partner is a Delaware limited liability company. The General Partner has no employees or bank accounts.

The General Partner, alone or with others, formed the Limited Partnership. The General Partner operated as a "pass through entity" and the sole general partner of the Limited Partnership. The General Partner owned 0.0349766% of the Limited Partnership and had the right to bind the Limited Partnership. If the Limited Partnership's investments reached a certain profitability, the General Partner would receive an incentive fee.

On behalf of the Limited Partnership, the General Partner contracted with LAM to manage the Limited Partnership's business affairs. The General Partner also delegated all its responsibilities and powers with respect to managing the Limited Partnership to LAM. The General Partner never engaged in any business activities aside from retaining LAM to manage Limited Partnership.

**LAM**

LAM is a Delaware limited liability company owned by Paul Coughlin (99%) and Carol

5

Ann Coughlin (1%). LAM is the sole member of the General Partner.

LAM provided contractual management services to pooled investment vehicles. In this respect, LAM "existed to do nothing but manage partnership business" for the Limited Partnership. LAM's duties included identifying investments, filing tax returns and regulatory documents, and overseeing the Limited Partnership's accounting and professional matters.

LAM hired professionals on behalf of the Limited Partnership, such as lawyers and accountants. LAM and the Limited Partnership shared business addresses, for which LAM paid the rent. LAM maintained its own separate books of accounts. The books and records of the General Partner and the Limited Partnership were stored and in possession of LAM.

Paul Coughlin, Rich Latto, Steve Zambito, Leon Komkov, and Anne Whitman (collectively, the "LAM Principals") were employees of LAM and managed the investment activities of the Limited Partnership. Each of these individuals had the authority to bind LAM, the General Partner, and the Limited Partnership.

Every action LAM took on behalf of the Limited Partnership was expressly authorized under its management agreement with the Limited Partnership and through the powers it had been delegated by the General Partner. No one other than LAM had authority to act on behalf of the Limited Partnership.

There was no agreement, written or oral, between LAM and the Limited Partnership to be in a partnership. LAM had no ownership interest in Limited Partnership. LAM never made payments to the Limited Partnership. LAM did not share in the profits or losses of the Limited Partnership. LAM did not file joint tax returns with the Limited Partnership.

LAM owned no interest in BMT-NW Acquisition, LLC ("BMT-NW Acquisition") or

6

Graver Tank Co.[3] ("Graver"), and did not share in their profits or losses. LAM never loaned money, or made any financial contribution, to BMT-NW Acquisition or Graver. Nor did LAM have any control over the income or capital of BMT-NW Acquisition or Graver, including the right to make withdrawals from their accounts.

LAM never made payments to Broad Street or received fees or other financial compensation from Broad Street. LAM owned no interest in Broad Street.

**LAM's Management Fee**

The Limited Partnership compensated LAM for its management services through a management fee. LAM's management fee—both from the Limited Partnership and other pooled investment vehicles—was its sole source of income.

LAM's management fee did not vary based on the profitability or the non-profitability of Limited Partnership's investments but could differ year by year because of offsets. For example, the management fee could be reduced by at least 80% if LAM received "any transaction fees, monitoring fees, directors' fees, break-up fees and other fees" from the Limited Partnership's portfolio companies. If the organizational expenses exceeded $1 million, the management fee was reduced by 100%. And LAM had discretion to waive the management fees in whole or part.

LAM never received fees, payments, compensation, distributions, dividends, fees, or other monies from the Limited Partnership's portfolio companies, including BMT-NW Acquisition and Graver.

During the Limited Partnership's "investment period," which was five years, the management fee the Limited Partnership owed to LAM each year was equal to 2% of the aggregate capital commitments of the limited partners, less certain offsets. In 2014, for example, the Limited

---

[3] As best the Court can tell, Graver Tank Co. fabricated large steel tanks.

7

Case 4:23-cv-00738-DGK   Document 124   Filed 08/19/25   Page 7 of 19

Partnership paid LAM a management fee of $4,870,108.

A "harvesting period" followed the five-year investment period. The harvesting period is when the Limited Partnership's assets are disposed of, and distributions are made to the limited partners. During the harvesting period, LAM's management fee was based on the market value of the assets, not the $283 million in aggregate capital commitments, and was calculated at 1.5%. In 2015, for example, when the Limited Partnership transitioned to the harvesting period, the Limited Partnership paid LAM a management fee of $267,132.

**Investment Approach**

A private placement memorandum was prepared on behalf of LAM and/or the Limited Partnership. The apparent purpose was to raise capital for the Limited Partnership's investment activities.

In relevant part, the private placement memorandum states the following:

> [The Limited Partnership] . . . will be organized by [LAM] to continue its strategy of acquiring debt securities, obligations, and assets of distressed companies and obtaining control of such companies through a restructuring process.
>
> . . .
>
> The [Limited Partnership's] investment activities will be managed by Paul Coughlin, Rich Latto, Steve Zambito, Leon Komkov and Anne Whitman . . . . In addition, [LAM] has established a team of Operating Advisors to provide expertise and resources in the management of portfolio companies.
>
> . . .
>
> [LAM] focuses on identifying lower middle market distressed companies across a wide range of industries with enterprise values typically under $150 million and revenues between $50 million and $400 million. . . . [LAM] typically seeks investment in distressed situations where it can achieve effective control over the governance of the business under normalized business conditions. Post-restructuring, [LAM] often adopts a traditional private equity approach of providing management with the capital and the strategic

and operational direction necessary to grow the business, maximize cash flow and improve the overall prospects of the business.

. . .

The [Limited] Partnership's investment strategy is based on active management of the reorganization process with respect to its portfolio companies.

**The Portfolio Companies**[4]

In early 2011, LAM Principals Leon Komkov and Rich Latto met with JP Morgan Chase Bank ("JPM") to see if JPM had any loans it wished to sell to the Limited Partnership. Leon Komkov and Rich Latto were interested in grade B performing loans that could be purchased at a discount to account for the risk associated with such loans. JPM informed them about certain senior secured revolving loans that JPM had made to Brown-Minneapolis Tank – Northwest, LLC[5] ("BMT-NW") (the "JPM loans"). The JPM loans were collateralized substantially by all of BMT-NW's assets.

BMT-NW had an obligation to contribute to the Fund on behalf of its union employees. LAM was aware of this obligation, and before purchasing the JPM loans, LAM inquired about potential withdrawal liability that may be attributable to BMT-NW. No Plaintiff ever owned any interest in BMT-NW.

To purchase the JPM loans, LAM—acting on behalf of the Limited Partnership—created and incorporated Broad Street as a subsidiary of the Limited Partnership, and appointed the LAM Principals to its board of directors. The Limited Partnership owns 95% of Broad Street, and Charles Travelstead owns the other 5%.

---

[4] The Court limits its discussion to BMT-NW Acquisition and Graver. It takes no position regarding BMT-NW, BMT-NW, LLC, or Reliable Steel.

[5] As best the Court can tell, Brown-Minneapolis Tank – Northwest, LLC fabricated large steel tanks.

9

The Limited Partnership invested sufficient funds in Broad Street to purchase the JPM loans and to fund anticipated working capital and operating needs of BMT-NW. With respect to this transaction, LAM Principals signed on behalf of the Limited Partnership and Broad Street.

Broad Street then created BMT-NW Acquisition under the laws of Delaware and loaned it the amounts necessary to purchase the JPM loans. Broad Street is the sole member and 100% owner of BMT-NW Acquisition. Richard Latto, Anne Whitman, Steve Zambito, and Leon Komkov were the initial managers of BMT-NW Acquisition.

Between June 2011 and August 2011, Broad Street invested additional funds in BMT-NW Acquisition to permit it to advance additional loans to BMT-NW, to fund BMT-NW's ongoing working capital requirements. Despite the additional funds, BMT-NW defaulted on its loan agreements to BMT-NW Acquisition.

In August of 2011, BMT-NW Acquisition declared default and conducted an Article 9 foreclosure of substantially all BMT-NW's assets. Prior to the foreclosure of BMT-NW, the BMT-NW Acquisition's officers were Charles Travelstead, Mark DeMoss, Rollie Irwin, Tracy Roberson, and Debbie Eggleston.

Also in August of 2011, BMT-NW Acquisition signed a collective bargaining agreement obligating it to contribute to the Fund.

BMT-NW's assets largely consisted of receivables arising under partially performed contracts for the construction of steel tanks and related items. To retain the value of BMT-NW's construction receivables, it was necessary that the construction contracts be completed. Neither BMT-NW Acquisition nor Broad Street had the ability to complete the construction contracts. Accordingly, BMT-NW Acquisition hired certain former officers and employees of BMT-NW to operate the assets and conduct BMT-NW Acquisition's business operations.

BMT-NW Acquisition operated at a net loss in 2011 and 2012, and sales declined by approximately six million dollars between 2012 and 2013. On February 14, 2014, BMT-NW Acquisition permanently ceased all covered operations and filed for bankruptcy.

In 2011, Broad Street acquired 100% of the stock of Graver from Charles Travelstead in exchange for 5% of the stock of Broad Street. After this transfer, the officers and employees of Graver remained unchanged. Graver was a contributing employer to the Fund. Graver continued to operate until April 2015, at which point it made its final contribution to the Fund and permanently ceased covered operations.

After May 10, 2015, neither LAM, the Limited Partnership, the General Partner, nor their respective officers, employees, or agents had any involvement with BMT-NW Acquisition or Graver.

**Active Management**

The board members of the Limited Partnership's portfolio companies, including BMT-NW Acquisition and Graver, oversaw the performance and operations of those companies. Each of the Limited Partnership's portfolio companies had at least one board member that was elected or appointed by LAM. LAM appointed or elected these board members pursuant to the delegation of authority from the General Partner.

At one point during the years of 2011 to 2015, each of the LAM Principals sat on the boards of BMT-NW Acquisition and Graver. LAM's Principals monitored what was going on and were instructed to perform the duties of a board member when serving on the boards of the Limited Partnership's portfolio companies.

LAM formed a team of operating advisors consisting of five persons, Derek Fitteron, Wayne Frerichs, Daniel Larkin, Jim Polakiewicz, and Lewis Rudy, to "support its efforts as needed

11

in evaluating new investments, conducting operational due diligence, sitting on boards of directors and taking senior management roles during and after the reorganization process." These operating advisors were "typically compensated by the portfolio companies" for their services. Dan Larkin and Jim Polakiewicz were advisors to BMT-NW Acquisition and/or Broad Street.

At no point did Broad Street or any Plaintiff exercise control over the day-to-day business operations of Graver. No officer, director, employee or agent of Limited Partnership, General Partner, or LAM had signatory capacity on any bank account of Graver.

## Discussion

Plaintiffs argue they are not "employers" for purposes of the MPPAA's withdrawal liability provision. Defendants contend that each Plaintiff falls within the provisions' reach.

### I. Withdrawal Liability under the MPPAA.

The MPPAA was enacted "[t]o alleviate the problem of employer withdrawals" from multiemployer pension plans and the "extreme financial hardship" that often resulted. *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 215–16 (1986). To that end, the MPPAA imposes withdrawal liability on employers who exit such plans, requiring them to pay a proportionate share of the plan's unfunded vested benefits. *See* 29 U.S.C. §§ 1381, 1391; *Connolly*, 475 U.S. at 217.

To enforce withdrawal liability, the MPPAA treats all "trades or businesses (whether or not incorporated) which are under common control" as "a single employer." 29 U.S.C. § 1301(b)(1). This means that withdrawal liability "extends beyond the business entity withdrawing" and is "joint and several as to all" commonly controlled entities. *Vaughn v. Sexton*, 975 F.2d 498, 502 (8th Cir. 1992); *Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 138 (1st Cir. 2013). This effectively "pierces the corporate veil and disregards formal business structures" to ensure commonly controlled entities "cannot shirk[] their ERISA obligations by fractionalizing operations into many separate entities."

12

*Sun Cap. Partners III, LP*, 724 F.3d at 138; *Cent. States Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 878 (7th Cir. 2013).

Under this framework, imposing withdrawal liability on an entity other than the withdrawing employer is a two-pronged inquiry: (1) is the entity a trade or business; and (2) is the entity under common control with a withdrawing employer. *Vaughn*, 975 F.2d at 504. The first prong is a "factual inquiry" that considers the entity's activity. *Id.* at 502; *Messina Prods., LLC*, 706 F.3d at 878. The second prong is a bright line test that considers whether the entity has an 80% ownership interest in a withdrawing employer. 26 C.F.R. § 11.414(c)–2(b)(2).

This bright line test, however, can be easily avoided by fractionalizing ownership across multiple entities. Thus, in circumstances where an entity's ownership does not meet the 80% threshold, courts consider whether it is in a partnership-in-fact with other entities, such that their aggregate ownership meets the 80% threshold. *See Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 943 F.3d 49, 57 (1st Cir. 2019); *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 854, 861 (E.D.Mich.2010); *see also* 26 C.F.R. § 1.414(c)–2(a) (noting that a partnership qualifies as a trade or business for the purposes of withdrawal liability). If such a partnership-in-fact exists, courts then determine whether the recognized partnership is a trade or business. *Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 172 F. Supp. 3d 447, 466 (D. Mass. 2016), *rev'd on other grounds*, 943 F.3d 49.

Based on the parties' briefing,[6] the following is not in dispute: (1) both the General Partner

---

[6] In the initial round of summary judgment briefing, neither LAM nor the General Partner argued that they were not "trades or businesses." *See* ECF No. 63 at 10–15, (arguing only the common control element); ECF No 67 at 10–15, (same). Their current briefing follows the same course. *See* ECF Nos. 98, 100. Likewise, in the initial round of summary judgment briefing, the Limited Partnership did not argue that it failed to meet the 80% ownership threshold necessary to establish common control with BMT-NW Acquisition or Graver. *See* ECF No. 65 at 8–15. Defendants raised this point in opposition, *see* ECF No. 79 at 6, but the Limited Partnership did not directly respond in its reply, *see* ECF No. 85 at 1–2. In denying summary judgment, the Court noted that, based on the parties' briefing, it appeared

and LAM are trades or businesses; (2) neither LAM nor the General Partner meet the 80% ownership threshold to establish common control; and (3) the Limited Partnership, through its sole ownership of Broad Street, holds a 95% interest in BMT-NW Acquisition and Graver.

Thus, the relevant inquiries are: (1) whether the General Partner and/or LAM are in a partnership-in-fact with the Limited Partnership and/or Broad Street such that their ownership is aggregated; and (2) whether the Limited Partnership is a trade or business.

## II. The partnership-in-fact inquiry.

Because neither the General Partner nor LAM meet the 80% ownership threshold to establish common control, the Court considers whether they should be treated as a partnership-in-fact with the Limited Partnership and/or Broad Street.

Whether a partnership-in-fact exists in this context is a question of federal law. The Internal Revenue Code provides the relevant definition:

> The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

26 U.S.C. § 7701(a)(2). Courts have identified various factors to consider when determining whether a partnership-in-fact exists, with none being dispositive. *See, e.g.*, *Comm'r v. Culbertson*, 337 U.S. 733, 742, (1949); *Luna v. Comm'r*, 42 T.C. 1067, 1077–78 (1964).

With these principles in mind, the Court turns to the question of whether the General Partner and/or LAM should be treated as a partnership-in-fact with the Limited Partnership and/or Broad Street. Because the answer to these questions is straightforward, the Court does not address

---

the Limited Partnership satisfied the 80% ownership threshold due to its ownership of Broad Street. *See* ECF No. 93 at 5–6. The Limited Partnership's current briefing does not argue otherwise. *See* ECF No. 96.

every argument raised in the parties' briefs.

### a. The General Partnership is not in partnership-in-fact with the Limited Partnership and/or Broad Street.

The undisputed facts establish that the General Partner, as the general partner of the Limited Partnership, contracted with LAM to manage the Limited Partnership and then delegated all its responsibilities and powers with respect to managing the Limited Partnership to LAM. Otherwise, the General Partner was a pass-through entity with no employees, bank accounts, or operational activity. This limited activity is insufficient to create a partnership-in-fact with the Limited Partnership and/or Broad Street.[7]

Accordingly, the Court finds that the General Partner is not an "employer" for purposes of the MPPAA's withdrawal liability provision.

### b. LAM is not in partnership-in-fact with the Limited Partnership and/or Broad Street.

The undisputed facts establish that LAM neither held ownership interest in nor shared in the profits or losses of the Limited Partnership, Broad Street, BMT-NW Acquisition, or Graver. Rather, LAM received a management fee pursuant to a contractual management agreement—a fee that did not vary based on the profitability of the Limited Partnership's investments. Further, every action LAM took was expressly authorized under its management agreement with the Limited Partnership or through the powers it had been delegated by the General Partner.

In other words, Defendants seek to impose withdrawal liability on an entity that held no ownership interest in the relevant entities and acted solely in a contractual management capacity. The Court is not persuaded that the MPPAA sweeps so broadly.

The cases that have discussed aggregating ownership through a partnership-in-fact have

---

[7] Although not briefed by the parties, the Court is skeptical that this limited activity renders the General Partner a "trade or business" under the MPPAA either.

15

done so in contexts where each entity possessed a substantial ownership interest in the withdrawing employer. *See Sun Cap. Partners III, LP*, 943 F.3d at 57 (aggregating ownership between two investment funds that respectively held 70% and 30% ownership interest in the withdrawing employer); *Palladium*, 722 F. Supp. 2d at 859 (aggregating ownership between three investment funds where "none of the entities separately owned over 80%" of the withdrawing employer); *cf. Culbertson*, 337 U.S. at 740 (noting "a partnership is created . . . when there is community of interest in the profits and losses"). Moreover, aggregation occurred among entities acting in their capacity as owners, not when they were acting in an agency role or under delegated authority. *See Sun Cap. Partners III, LP*, 943 F.3d at 57; *Palladium*, 722 F. Supp. 2d at 859.

Neither of these principles are present here. Although LAM indirectly owns a nominal interest—0.0349766%—in the Limited Partnership through its ownership of the General Partner, such a de minimis stake does not establish sufficient ownership to support aggregation. Moreover, the conduct Defendants argue demonstrates a partnership, is conduct expressly authorized by LAM's management agreement with the Limited Partnership or by authority delegated by the General Partner. Defendants cite no authority that supports collapsing the well-established distinction between agency and partnership. They also fail to address the threshold question of whether aggregating ownership in this context is permissible.

On these undisputed facts, the Court sees no legal basis for aggregating ownership through a partnership-in-fact. Accordingly, the Court finds that LAM is not an "employer" for purposes of the MPPAA's withdrawal liability provision.

### III. The Limited Partnership is a trade or business.

Because the Limited Partnership, through its sole ownership of Broad Street, is under common control with BMT-NW Acquisition and Graver, the only issue is whether it is a trade or

16

Case 4:23-cv-00738-DGK    Document 124    Filed 08/19/25    Page 16 of 19

business. The MPPAA does not define trade or business, and neither the Eighth Circuit nor Supreme Court have done so either. *See* 29 C.F.R. § 4001.3; 26 C.F.R. § 1.414(c)–2; *Vaughn*, 975 F.2d at 502. Naturally, the parties point the Court toward different standards.

Defendants contend the Eighth Circuit's decision in *Vaughn* settles this issue. The Court is not persuaded. In *Vaughn*, the court addressed whether a family trust that leased property to commonly controlled entities qualified as a trade or business, and held the economic activity met the requirements of a categorical test. *See id.* at 503; *see also Pension Benefit Guar. Corp. v. Findlay Indus., Inc., et al.*, 902 F.3d 597, 607–08 (6th Cir. 2018) (discussing the categorical test). The facts here, however, differ in meaningful respects. The Limited Partnership does not engage in leasing activities, nor does it resemble the family trust evaluated in *Vaughn*. Accordingly, *Vaughn*, as relied upon by Defendants, does not control the analysis here.

Plaintiffs argue that the appropriate standard is the two-part test articulated by the Supreme Court in *Commissioner v. Groetzinger*, 480 U.S. 23 (1987), a case arising under the federal income tax laws. Under that test, economic activity qualifies as a trade or business if: (1) the "primary purpose for engaging in the activity [is] for income or profit"; and (2) the activity is conducted "with continuity and regularity." *Id.* at 35. Several courts apply *Groetzinger* in the MPPAA context. *See, e.g., Connors v. Incoal, Inc.*, 995 F.2d 245, 250–51 (D.C.Cir.1993); *UFCW Loc. One Pension Fund v. Enivel Props., LLC*, 791 F.3d 369, 373 (2d Cir. 2015); *but see Pension Benefit Guar. Corp. v. Findlay Indus., Inc., et al.*, 902 F.3d 597, 606 (6th Cir. 2018) (declining to adopt the test for purposes of the MPPAA).

In the context of private equity funds, some courts have refined *Groetzinger* by applying what has come to be known as the "investment plus" approach which requires activity beyond mere passive investment in portfolio companies. *See Palladium*, 722 F. Supp. 2d at 869–70;

*Messina Prods.*, 706 F.3d at 881; *Sun Cap. Partners III, LP*, 724 F.3d at 141. The Pension Benefit Guaranty Corporation ("PBGC"), the government agency responsible for promulgating regulations under the MPPAA, has informally promoted the investment plus approach in both a 2007 PBGC Appeals Board decision and an amicus brief. *See* Brief of Amicus Curiae Pension Benefit Guaranty Corporation in Support of Appellee, *Sun Cap. Partners III, LP*, 943 F.3d 49, 2019 WL 3231776 at *23–24.

The Court finds the investment plus approach persuasive. Not only does it align with other courts and the PBGC's informal guidance regarding private equity funds, but it aligns with the Eighth Circuit's directive in *Vaughn* that "determine[ing] whether a particular entity should be considered a trade or business" is a "factual inquiry." 975 F.2d at 502.

Here, the undisputed facts establish that the Limited Partnership was more than a passive investor because it actively managed its portfolio companies. The private placement memorandum clearly outlines the Limited Partnership's investment strategy including but not limited to "active management of the reorganization process," "achiev[ing] effective control over the governance of the business," and providing the "strategic and operational direction necessary to grow the business, maximize cash flow and improve the overall prospects of the business." The Limited Partnership carried out its investment strategy through LAM, its sole management agent.

LAM used its express authority—both under its management agreement with the Limited Partnership and through the powers delegated by the General Partner—to engage in the acquisition, management, and restructuring of the Limited Partnership's portfolio companies. To accomplish this, LAM created subsidiary entities, such as Broad Street, and exercised authority to oversee and direct the portfolio companies' operational affairs, including placing LAM Principals on the boards of portfolio companies, and embedding its operational advisors within those

companies to provide strategic direction.

The Court finds that this conduct goes beyond mere passive investment activity and satisfies the "plus" factor under the investment plus framework. Moreover, the Limited Partnership's activities were conducted with continuity and regularity over multiple years—i.e., the "investment" and "harvesting" periods—and with the primary purpose of generating profit for its limited partners.

Accordingly, the Court finds that the Limited Partnership is an "employer" for purposes of the MPPAA's withdrawal liability provision.

## Conclusion

For the forgoing reasons, the Limited Partnership's motion (ECF No. 95) is DENIED, LAM's motion (ECF No. 99) is GRANTED, the General Partner's motion (ECF No. 102) is GRANTED, and Defendants' motion (ECF No. 104) is GRANTED IN PART and DENIED IN PART. Within thirty (30) days of this Order, Defendants shall file a motion regarding the amount of damages owed to the Fund for purposes of its counterclaim.

**IT IS SO ORDERED.**

Date:  August 19, 2025  /s/ Greg Kays
GREG KAYS, JUDGE
UNITED STATES DISTRICT COURT